Good morning and may it please the court. My name is Samuel Ekman and I represent petitioner Diogenes Jasso Bernal. I would like to reserve three minutes for rebuttal. This court should grant Mr. Jasso Bernal's petition for review and vacate the immigration judge's removal order because the immigration judge did not properly evaluate Mr. Jasso Bernal's competency to proceed without counsel or any other procedural safeguards and because the immigration judge and BIA applied an incorrect legal standard in assessing Mr. Jasso Bernal's CAC claim on the merits. First, the immigration judge made its competency determination without obtaining Mr. Jasso Bernal's current medical health records. To be sure, DHS did disclose mental health records for Mr. Jasso Bernal when it submitted its Franco Gonzalez notice in this case. That was on June 13th, 2016. This was not adequate, however, because it was more than a year later before the IJ conducted a merits hearing on May 5th, June 14th, and August 9th, 2017. This is a per se violation of the INA and its implementing regulations. As the BIA wrote in Matter of MAM, the DHS has an obligation to provide the court with relevant materials in its possession that would inform the court about the respondent's mental competency. This is echoed in the Franco Gonzalez permanent injunction, which states... Is there any doubt that the DHS knew about the subsequent medical evaluations or mental evaluations? It would be hard to say that it didn't. In the Franco Gonzalez notice that was submitted on June 13th, it stated that there would be a follow-up examination of Mr. Jasso Bernal. Additionally, it appears from the record, at least, that there's a regular routine wellness checkup that happens. And when Mr. Jasso Bernal first appeared before the immigration judge, he was actually being housed in the mental health unit at the ICE facility. So it would be very odd, I think, if there were no subsequent mental health records here. He was being detained. He was being treated. He had just been diagnosed with unspecified psychosis by an MD on the DHS staff. And the last records that we have of a check-in with Mr. Jasso Bernal, his dosage for the antipsychotic drug risperidone had just been doubled. So it would be pretty odd if there was no other follow-up or mental health records in the ensuing year that took place between the submission of the Franco Gonzalez notice and the time that the marriage hearings took place. But he did tell the IJ that he was not receiving any medical treatment at the subsequent hearings. Is that correct? He had mentioned that he was not currently seeing a psychologist. He stated shortly thereafter that he had seen one that past Monday. I believe this was in one of his earliest hearings. The June 26th hearing. The first one was when he referenced having an appointment on Monday and the records, I believe from June 8th, indicated there'd be a follow-up on June 13th, which is before the June 26th hearing. And the records were produced on June 13th. That's correct. So beyond that, is there anything that suggests there were additional records? There was testimony that he had been moved out of the mental health unit between the original hearings in the summer of 2016 and when the marriage hearings took place in the summer of 2017. That wasn't really developed by the immigration judge in the proceedings, but he did indicate that he was no longer in detention. I think this was in the May 5th. It may have been the June marriage hearing, but he had explained to the immigration judge that he was no longer taking the antipsychotic drug that he was prescribed. The immigration judge asked, did the doctor tell you to stop taking it? He said, no, after I was moved out of segregation, out of the mental health unit, my cellmate said that he was also hearing these voices and that I should stop taking the drugs that had been prescribed by the facility's doctor. So we know that he was moved out of the mental health unit, at least As I mentioned, I think we'd have a bigger problem on our hands if there weren't at least some records indicating his mental health, given that they had themselves diagnosed Mr. Acebrunal with a serious psychotic disorder and prescribed a medication. What those would necessarily reveal, it's hard to say. We don't have them. But I think that's the precise problem here. And I think it's notable here that in the answering brief, DHS has pointed out that, has alleged at least, that there's no hard evidence that they have any medical records. But they haven't denied it either. And that's, I think, a little bit telling. He's still in custody, right? He is still in custody, yes. So your argument is not that the government failed to apply Mom or Franco Gonzalez, but rather that the IJ failed to obtain additional medical records, if any existed, and then didn't make, didn't have a competency hearing at the final hearing on August 9th. Those are basically the two. I think those are the two main claims. I do think there's an argument that the IJ lacked substantial evidence for its competency finding, but I don't think we need to get to that because of these procedural errors that require that the removal order be vacated outright. You know, again, as I mentioned. What's the relief? You'd ask, we vacate the, if we agree with you, that there were procedural errors, we would vacate the... Yes, I think that the... The agency's decision and remand it back for a further competency determination? That's correct. And that's what this court did in Calderon-Rodriguez, as well as in Mejia. They said the process was not followed correctly under MAM and under Franco Gonzalez. So we vacate the removal order. We remand for a competency hearing with a full record and any other evidence that might have developed in the meantime. And of course, MAM acknowledges that competency can change over the course of time. Maybe he's competent now, maybe he was never competent, maybe he was competent then, it's hard to say without the records. So we would do a new competency hearing and then if there's any supplemental evidence that can be developed on his claim for CAD relief, the IJ could entertain those arguments at that time. As I mentioned, in addition to failure to obtain Mr. Husser Brunel's current mental health records, the IJ also failed to conduct a judicial competency inquiry at the third marriage hearing on August 9th, 2017. At that hearing, Mr. Husser Brunel submitted more than 50 pages, 50 transfer pages of testimony concerning the torture that he faced at the hands of Mexican drug cartels. This too was a legal error that requires that the removal order be vacated. Mr. Brunel, according to the record, has a conviction for second degree burglary, which the IJ found would make him ineligible for asylum or withholding of removal. If we were to remand for further proceedings, it would seem the only available relief would potentially be CAT, is that correct? In the proceeding below, the judge was only considering eligibility for deferral of removal under CAT. He would not have been eligible for asylum or withholding of removal. Based on the competency issues, I think there are issues. If Mr. Husser Brunel was incompetent at his original hearings, he would not have been qualified to concede removability as he did here under the BIA's regulations and under the INA. I would argue, of course, that he would be eligible to further develop the evidence regarding that conviction, whether it's a particularly serious crime or whether it's otherwise a bar, to withholding of removal or other relief. But he would, at a minimum, be eligible to continue to pursue his claim for CAT relief. So the IJ's finding of the prior conviction was not simply based on petitioner's concession. There were records produced. There were, that's correct. So there was documentary evidence that was produced and was discussed at some length, I believe, in the January hearing, 2017. There was a continuance in order to allow that documentary evidence to be produced to try to figure this out. So I mean, whether that would be sufficient to affirm, I suppose, the denial of other forms of relief is, I think, still an open question and not really presented here. If Mr. Husser was not competent at the first two hearings, it does raise a question whether really anything that happened when he was not competent can be upheld. I do just want to take a moment to emphasize, because in the answering brief, the government seems to suggest that the fact that the immigration judge conducted a judicial competency inquiry at the first and second merits hearings in May and June of 2017 essentially forgives the failure to do so at the third merits hearing in August of 2017. And I submit that's not correct. As the immigration judge herself recognized on May 5th, to quote her, I do need to ask questions in regard to an MAM situation in every hearing where he is presenting testimony. And that is especially so here when we saw that Mr. Aso-Bernal could experience very rapid and quick changes in his mental state. For example, the limited mental health records that we do have from while he was detained, they cover six weeks from April to June 2016. And from when he was first brought in on April 25th, the evaluator noted that he had a risk of PTSD, a little bit of anxiety, but was otherwise fine. A month later, he was admitted to the facility's mental health unit. A few days after that, he was diagnosed with unspecified psychosis. A few days later, he was diagnosed with an anti-psychotic drug. And by June 8th, he had that dosage doubled. And again, this was just over the course of six weeks, which is less than the amount of time between the last judicial competency inquiry that the immigration judge conducted in June of 2017 and the August hearing at which he presented, again, more than 50 pages of testimony. So in light of this record evidence that we already have, I think it forecloses any argument that we can look over the failure to conduct that judicial competency inquiry, especially when he had already been identified as a potential Franco Gonzales class member. Third and finally, the BIA erred by applying several incorrect legal standards to evaluating Mr. Acebernal's CAD claim on the merits, that is, whether it is more likely than not that he would be tortured if he were removed to Mexico. The government argues that the only basis for the BIA's decision here is that the Mexican government would not acquiesce in any torture. And for that reason, I'm going to focus on that issue. The BIA erred as a matter of law by considering only whether the Mexican government was willing to stop torture, but not whether it was able to do so. And this lies in face of the court's decision in Madrigal, where the court held, and to quote, the inquiry about whether Mexican officials would acquiesce in torture is related to the inquiry in the asylum context of whether the Mexican government is not just willing, but also able to control private torture. Again, quoting, both require examining the efficacy of the government's efforts to stop the drug cartels. The BIA relied on Garcia Millon, which held that a government does not acquiesce in torture of its citizens merely because it's powerless to stop it. That case was distinguishable because it held only that a mere general inability to stop violence was insufficient, even when But in this case, the BIA also found that there was no past torture. And in fact, that in several instances, government officials assisted Mr. Bernal. There was no evidence of past torture the court held, the immigration judge held. The question here is whether it's more likely than not that he will be tortured in the future. And I think these instances of obtaining a little bit of help from government officials while those officials would be lauded for it, is proof rather than disproof of the likelihood of future torture. He's had three instances in which he narrowly escaped members of this cartel shooting at him. He was carjacked and narrowly escaped. He got lucky a few times, no doubt. And some of that was due to the assistance of individuals in the Mexican government. The question is, how long will that luck last if he's removed to Mexico? And I will emphasize that they're incapable of controlling private conduct. I mean, the fact they were successful in helping him in the past, we should disregard that and just assume they can't do it in the future. Well, I think that Mr. Bernal here credibly testified that in each of these cases, these officials told him, you got to leave. These are huge cartels. We're not able to protect you from them. And there's, you know, he was in Sayulita. This is on page 236 of the administrative record. The police told him to file a report or better yet, to leave. When he was in Mexico City, they told him, it's a very big cartel. If you have family in the United States, you need to get to the United States. Federal police told him, no one can help you. It's better that you come here to the United States because all the federal police have family and these people do not touch their hearts when it comes to family. And his last stop in Chetumal near Cancun, the police told him, no one is going to help you because the cartel is following you. They're the biggest in the whole country. It's better that you just leave. This is, I think, beyond just how effective are they going to be? Can they track them down? The evidence does establish, I think, at least a very strong likelihood that they are unable, despite their best intentions or anything like that, to protect him in a situation like this. You want to save some time for the final question. Yes, exactly. Thank you. All right. Thank you. May it please the Court. I'm Christina Greer on behalf of the United States government. So there are three issues in this case as they've been presented. First is whether the record compels the finding that Mr. Bernal was mentally incompetent to participate or represent himself. The second is whether he has made a due process claim based on perceived errors in the immigration judge's competency evaluation. And third, whether the record compels the conclusion that the government of Mexico will acquiesce, not just be unable or unwilling to protect him, but acquiesce to his torture. Ultimately, the agency properly found Mr. Bernal competent and found that he did not meet his burden to show that the government acquiesced to his torture. Did the IJ comply with all MAA procedural requirements? Yes, the immigration judge did. So are you asking about just matter of MAM or matter of MAM as well as Franco? Both. I should have made it clear. Both immigration judges complied with both Franco and matter of MAM. Under the settlement agreement in Franco, a detained petitioner, or I apologize, a detained non-citizen who, especially here, there was a notice of class membership. And so the immigration judge said there's a notice of class membership. I have to have a judicial competency inquiry under the settlement agreement. The immigration judge did that. He probed competency to participate under MAM and competency to self-represent under Franco. And at the end of the hearing, found Mr. Bernal competent. In fact, concluded consistent with Franco that there was no reasonable cause to believe that despite the diagnosis of psychosis, that he is suffering from a mental disorder to a degree that impairs his ability to meaningfully participate in the proceedings or to perform. There are several hearings here, right? Yes, Your Honor. You were just reading from it. Which hearing did that take place? That took place at the very first hearing on June 28, 2016. And when was the final merits hearing? The final merits hearing was on August 9, 2017. And did the IJ make another competency determination at that time? A new immigration judge did. Did a new immigration judge make another competency determination at that time? Yes, Your Honor. And did they obtain all the medical records that were available? Importantly, under Franco, the detained individual class member is only entitled to one judicial competency inquiry. So importantly, the settlement agreement doesn't provide for multiple judicial competency inquiries. Well, MAA says that there's an obligation to assess the competency throughout the proceedings. Throughout the proceedings, but it doesn't state that at the beginning of every hearing, unlike the immigration judge stated that there's a requirement that she consider competency or, I guess, do another competency evaluation at the beginning of every hearing, but that's not what MAM requires. Is it your position that there were no other medical records available? As far as I know, I do not know. But as far as what we can tell. Take from that one medical record that seems to suggest that there was another scheduled appointment date. It said that there was a follow-up on June 13th, and then he testified on June 28th, so about two weeks later, that he had another follow-up, but that he's no longer seeing any psychologists. And then a year later, during the first merits hearing on May 5th, 2017, when the immigration judge asked whether he was seeing anyone, he stated that he was not. He had in the past, but he's not seeing anyone, and that he's not on any medications for any mental issues. It was, I believe, high blood pressure. He was taking some medication for that. But he wasn't on any medications for any mental health issues. Our recent case in Calderon Rodriguez seems to suggest that there might be error here, procedural error. Calderon is distinguishable from this case. In Calderon, there was actually evidence in the record that there was a mismatch between the documents that the applicant was presenting, or the non-citizen, the petitioner, was presenting, and what ICE had presented. So ICE presented one list of medications, and then a little bit later Calderon presented his list of medications, and it wasn't compatible. So there was evidence that something was going on during that time period. So there was evidence in the record that there were more records. But here there's absolutely no evidence in the record. The petitioner never stated that he was having any sort of problems of a mental competency nature during those subsequent hearings. In fact, it's important to note that many of what are termed as delusions, he states, you know, they kind of misunderstood me. They thought I was saying that there were people crawling in the ceiling, but it wasn't that. I heard people stomping and I heard noises from upstairs, and they told me there's a gym up there and they're dropping weights. And he makes several of these statements where, yes, they thought that I was talking about just voices in the air, but what I'm hearing is the other detainees speaking through the air vents, and that's how we communicate with each other is by speaking through the air vents. And so there's a question about, you know, is this a competency issue? But ultimately the immigration judge during the judicial competency inquiry, which was the only one required by Franco, because as I said, Franco does not have any sort of, which is a negotiated settlement agreement. It doesn't have any provision for subsequent judicial competency inquiries after that initial inquiry. The only subsequent reviews that it discusses are about restoration of competency. It doesn't have any provisions about judging whether a year later, you know, after a certain period of time a person must have another judicial competency inquiry. It just provides for the first one. Is there anything in Franco that, in the Franco settlement agreement, the final order that says that the procedures here supplant any other procedures that the BIA has adopted? No, it does go alongside matter of MAM. Right, so MAM would still apply, correct? Matter of MAM does still apply, but it does not state that at every hearing there must be an inquiry. No, it doesn't state that, but it says that throughout the proceedings the IJ should make a determination. You know, it says competency. Exactly, and while there were three hearings a year later, at the very beginning of that first master calendar hearing, a new immigration judge came on on May 5th. She probed into Jasso Bernal's competency. At the next hearing she did it again. At the third hearing she didn't explicitly do so. However, she had just observed Mr. Jasso Bernal for many hours testifying over several recent months, and so it's understandable that a fact finder would be able to gauge whether someone is a little different today than he was three weeks ago and a month and a half ago. She'd already seen him for multiple hours testify at length. His testimony didn't differ from the first two hearings. There's no indicia of incompetency that's any different on that third hearing in the record, and Petitioner has not pointed to anything in the record that shows, well, here's an indicia that things had changed in that third hearing, and so it's reasonable to rely on the immigration judge's observations of Mr. Jasso Bernal, whom, as I said, she'd already observed for multiple hours over the course of several months. And then at the end of that hearing is when she found him competent. And again, the determinations in this case withstand substantial evidence review because, as noted, Mr. Bernal was able to fill out his own application for asylum without any help. He wrote it in English. He wrote several declarations. He was able to appeal to the board on his own. He submitted documents that even I said they had difficulty obtaining, and so he did a good job representing himself. He presented his claim, and there's nothing in the record that compels a contrary conclusion. And as to a due process claim, Petitioner has failed to make such a claim. And in Petitioner's first brief, that was sort of how the claim was being termed as a due process claim, and so we responded with, there's no due process violation here, and also no prejudice has been shown. So first, he did not show any due process violation. There's no evidence other than speculation that there were any other records, except perhaps that one mental health follow-up on June 13th, and there may have been another one on a Monday in the two-week span. But unlike Calderon, where the record that the IJ relied on was a year old, here it was a couple weeks old. And then he said, I'm no longer seeing the psychologist. And so there's no indication that after that June judicial competency hearing that there were any other records of his competency or bearing on his competency. And so second, he's alleged no prejudice. He hasn't said what he would have presented differently. He presented hours of testimony on his claim. His claim was deemed credible. And even further than, say, in JRRA, which says that one safeguard can be deeming someone credible as in they sincerely believe their claim, the immigration judge actually treated everything he testified to as true. And so that even goes a further step than what safeguards are generally available for someone who's incompetent. He was found to be credible. His claims were taken as true. And his claim was evaluated on the grounds that he presented. The immigration judge also gave him multiple continuances. The reason why this case took a year was because Mr. Jasso Bernal kept saying, well, I can go back to this city in Mexico, or if you can remove me through this city, I'll be fine. And so the immigration judge continued to help him, to allow him to work with ICE to see, well, could they remove him through another port of entry. And this is frankly something that I've never seen. It's very unique that ICE was willing to work with him to try to remove him through another port of entry. They were able to offer him one location. He said that was not all right. And so that's when they went forward. I just wanted to – I was just looking here at the medical – at the assessment that was done on 6-8-2016. It's before – I'm sorry, which page of the record? Well, I've got numerous pages. Oh. But it apparently was done on 6-8-2016. Yes. You made a comment about some of his explanations that he had offered or about hearing noises? Yes, Your Honor. But on the second page, there's a paragraph that says, Titani spoke at length about the A.H. he's been hearing. He went through a variety of possible explanations for this, such as another inmate crawling around in the ceiling. And there's a semicolon, and then it says, He has been informed by multiple staff that there is no second floor above and cell in which other detainees are housed. Yes. There was a gym. So on page 159 – So there was a second floor? Well, it says there's no second floor in which other detainees are housed. That doesn't mean there's no second floor. Uh-huh. And so he testified on page 159 of the record. He stated that – let me get the exact wording. He stated – so the immigration judge asked him, Now you had told one of the mental health people that interviewed you that you'd seen detainees crawling on the ceiling. Is that not correct? And he said, I was talking to the officer when I was placed in the medical unit. I heard on the ceiling, like, metal, like a rock that was going to be allowed to fall on me. So I told the psychologist to have them move me. But then I was later told that there was a gym upstairs and that noise were weights. Okay. And it says, I told them because they made me believe that up above they were walking, they were – and, yeah, he explains that it's noises from the gym upstairs. And so that portion, it doesn't say that there's no second floor. There's just no second floor in the cell in which other detainees are housed. Oh, he was diagnosed with some sort of psychosis. He was. And that's what triggered the competency inquiry. And so that's – yes, he was. I didn't mean to distract you from the points you were making, but go ahead. No problem. I appreciate your questions. And so, ultimately, Jasso Bernal doesn't argue what would have changed had he had different safeguards. There's no indication that he would have presented any different evidence or argument or a different claim. It's entirely speculative what would have been different here. So, like I argue, there's no – he hasn't shown a due process violation. And finally, as to CAT, the standard for CAT is acquiescence. It's not unable and willing. With acquiescence, the government or an actor within the government or someone acting under color of law must know and be willfully blind or consent to the harm that's occurring. And here, every time Mr. Bernal went to the police, they helped him. He alleges multiple instances where cartel members – he believed cartel members were chasing him or they shot in the air. There's no evidence that they ever shot at him. And every time he ran to the police and the police helped him. They got him a taxi to go to the bus station. They gave him money. He was allowed to sleep in the police station. And there was never a time where he went and sought assistance from the police, and they said no. Okay. Thank you, Your Honors. Thank you, Your Honors. And just a few quick points to make here. Counsel for the government indicated that there was, in fact, a second floor in the detention center. I would direct the court to the mental health review that was conducted the day before the one you cited, Judge Pai, as this is on page 408 of the administrative record. Detainee asked if there is a second floor. He was told that there is not. So it's true that the next page, or at the June 8th hearing, they said there was no second floor above the cell in which other detainees are housed. That other transcript, I think, makes clear that there was no second floor at all, and that in which other detainees were housed is somewhat superfluous. As to whether there were subsequent mental health records for Mr. Jose Bernal, I will just point out that from when he was detained, he was having weekly routine wellness check-ins. He had one on May 11th, 2016, on May 18th, 2016, on May 23rd, 2016, on a weekly basis. This is on pages 436, 434, 432 of the record. This was all before he was even in the mental health unit. Once he was in the mental health unit, his evaluator check-in said that he would be seen at least twice a week. In fact, for the time that we have records from May 26th to June 8th, he was seen 11 times. I would be curious, again, if that just all of a sudden stopped. I am out of time. That's fine. Thank you. Thank you. We appreciate your arguments. By the way, I understand that you were pro bono counsel? Yes, Your Honor. Under the courts program? Yes, that's right. Thank you very much. We appreciate that. It's been my pleasure. Very helpful. The matter is submitted at this time.
judges: Kelly, Paez, Bade